IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YOLANDA SAUL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No.: 08 C 569 |
| v. ) | |
| ) | Judge John W. Darrah |
| MARTIN and DANIELLE ) | |
| ZIMMERMAN, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff, Yolanda Saul ("Yolanda" or "Seller"), by her attorneys, Jenner & Block LLP, respectfully submits this Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment, as follows:

**INTRODUCTION**

This dispute arises as a result of Buyers' refusal to close on the purchase of a $3.2 million dollar townhome because the neighbor has the right, under a recorded restriction, to have the owner paint a small 6-foot strip of an exterior wall. Because the contract permits such restrictions of record, and the minor restriction of record at issue does not affect the merchantability of title, Buyers' refusal to close was a material breach. Buyers' attempt to seize upon the *de minimis* restriction in the midst of a deteriorating housing market, and use it in an attempt to negotiate a half-million dollar price reduction, shows Buyers' true motivation and their further breach of the duty of good faith and fair dealing. As a result, this Court should grant partial summary judgment for Seller on the issue of liability.

## BACKGROUND

Plaintiff, Yolanda Saul ("Yolanda" or "Seller"), and defendants, Martin and Danielle Zimmerman ("Zimmermans" or "Buyers"), entered into a residential real estate contract dated March 11, 2007 and modified on or about March 20, 2007. (Plaintiffs' Statement of Undisputated Facts ("SOF") at ¶ 5.) Pursuant to the contract, Buyers agreed to purchase from Seller a single-family townhome located at 101 East Bellevue, Chicago, Illinois 60611 ("the property") for a purchase price of $3,200,000. (*Id.* at ¶ 6.) An earnest money deposit of $160,000 is escrowed with the realtor pending the outcome of this case. (*See* Defendants' Counterclaim at ¶¶ 15, 17.)

Paragraph C ("the title provision") of the contract provides:

"At least five (5) business days prior to the closing date, Seller shall deliver to Buyers' attorney evidence of *merchantable title* in the intended grantor by delivering a Commitment for Title Insurance from Chicago Title & Trust bearing a date no earlier than February 1, 2007, in the amount of the Purchase Price, *subject to no other exceptions than those previously listed within this Contract*, and to general exceptions contained in the commitment."

Section 5 ("the deed provision") of the contract provides:

"At closing, *Seller shall execute and deliver to Buyer, or cause to be executed by Buyer, a recordable Warranty Deed* with release of homestead rights (or other appropriate deed if title is in trust or in an estate), or Articles of Agreement, if applicable, *subject only to the following if any: covenants, conditions, and restrictions of record;* public and utility easements; existing leases and tenancies; . . . ."

(SOF at ¶¶ 7-8 (emphasis supplied).)

Almost twenty years earlier, Yolanda and her husband, Dr. Richard Saul (together "the Sauls"), began construction on the property, including the building of a garage and a "mud room," or enclosed entranceway (*Id.* at ¶ 10.) The addition encroached by about three inches on the property located at 103 East Bellevue ("the adjoining property"), and the adjoining property owner, Thomas and Virginia Gohagan ("the Gohagans"), agreed to grant the Sauls an easement over the encroachment. (*Id.* at ¶ 11.) As consideration for the easement, the Sauls agreed to pay

the Gohagans $4,000.00, and to set back, or indent, by two feet an area of the mud room wall measuring six feet wide ("the setback area"), so the Gohagans could open their kitchen windows.[1] (*Id.* at ¶ 12.)

In addition, the Sauls agreed that upon reasonable advance written notice, and not more frequently than one time per year, they would engage a contractor at the Gohagans' expense to paint the exterior wall of the setback area that faces the Gohagans' property ("the setback wall"), but only to the extent the setback wall was visible from the Gohagans' windows. (*Id.* at ¶ 13.) The Sauls also agreed that upon reasonable advance written notice, and not more frequently than three times per year, they would engage a contractor at the Gohagans' expense to wash and maintain the Gohagans' windows. (*Id.* at ¶ 13.) Although the Sauls were entitled to "hire" the contractor for the Gohagans, the Gohagans were still obligated to pay all expenses associated with the painting or the window-washing. (Attached to the Declaration of Dr. Richard Saul is a diagram (Exhibit B) and photographs (Exhibits D1-D5) of the setback area.)

On or about June 20, 1990, these matters were memorialized in a document titled Declaration of Mutual Easements ("the Declaration") and recorded with the Cook County Recorder as Document No. 9029216. (*Id.* at ¶ 14.) The pertinent language of the document states:

>   2. <u>Saul Encroachment Easement</u>.  The Gohagans hereby grant to the Sauls an easement over the Gohagan Property starting at the Southwest corner of the Gohagan Property and running North along the Western lot line of the Gohagan Property for approximately thirty-seven feet and to a width of approximately three inches, as necessary (without disturbing improvements located on the Gohagan Property) for the purpose of constructing the Mud Room and Garage walls as described in the Settlement Agreement.

---

[1] There is otherwise no space between the east wall of the Sauls' home and the west wall of the Gohagans' home — requiring that the area across from the Gohagans' window be set back or indented so the Gohagans could open their windows. (*See* SOF at ¶ 12.)

    3.    <u>Gohagan Painting/Window Washing.</u>

    (a) Upon reasonable advance written notice from the Gohagans to the Sauls not more frequently than one time each calendar year, the Sauls shall hire, at the expense of the Gohagans, a reputable and mutually agreed upon contractor to paint the Easterly exterior side of the wall of the Mud Room facing the windows on the Gohagan Property to the extent that the wall is located within the Setback Area and is visible from the Gohagans' Windows (the "Setback Area Wall"). The notice from the Gohagans shall specify the type and color of paint to be used for painting the Setback Area Wall.

    (b) Upon reasonable advance written notice from the Gohagans to the Sauls not more frequently than three times each calendar year, the Sauls shall hire, at the expense of the Gohagans, a reputable and mutually agreed upon contractor to wash and/or maintain the Gohagans' Windows.

In almost twenty years, the Gohagans have never asked the Sauls to "hire" a painter or a window-washer. (*Id.* at ¶ 15.) Nor have the Gohagans ever attempted to paint the setback wall. (*Id.*)

On or about May 22, 2007, the Sauls delivered to Buyers a title commitment from Chicago Title & Trust, as required by the parties' contract. (*Id.* at ¶ 16.) The commitment contained a series of general exceptions. The commitment also contained the following specific exceptions:

> "(20)(A) Terms, provisions, and conditions relating to the easement described as parcel 2 contained in the instrument creating said easement. (B) Rights of the adjoining owner or owners to the concurrent use of said easement
>
> (21) *Covenants and restrictions* . . . contained in the document recorded June 20, 1990 as document no. 90292168 [the declaration]." (emphasis added)

(*Id.*) The title commitment defines "parcel 2" as the beneficial easement that permits Seller's property to encroach on the neighbor's property. (*Id.* at ¶ 17.) Thus, the title commitment contained an exception for the beneficial easement (paragraph 20), and an exception for the "covenants and restrictions" in the Declaration (paragraph 21).

4

On or about May 30, 2007, the date agreed upon for closing, Yolanda Saul was ready, willing, and able to close the transaction. (*Id.* at ¶ 19.) Nevertheless, Buyers refused to close the transaction purportedly due to the existence of paragraphs 20 and 21 of the title commitment. (*Id.* at ¶ 20; *see* Defendants' Second Affirmative Defense at ¶¶ 8, 10.) Buyers allege that they subsequently attempted to use these same matters to negotiate a significant reduction in price. (*See* Defendants' Second Affirmative Defense at ¶ 2.)[2]

On or about October 2, 2007, Yolanda Saul was forced to sell the property to another buyer for less money than the parties' agreed-upon contract price. (SOF at ¶ 22.)

## STANDARD OF REVIEW

Summary judgment is proper where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *First Indiana Bank v. Baker*, 957 F.2d 506, 508 (7th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ARGUMENT

To establish a breach of contract, the plaintiff must show (1) the existence of a valid contract; (2) the plaintiff performed all of her obligations under the contract; (3) the defendant materially breached the contract; and (4) the plaintiff suffered a resulting injury. *Klem v. Mann*, 279 Ill.App.3d 735, 740-41, 665 N.E.2d 514, 518 (1st Dist. 1996). Here, there is no dispute that the parties entered into a valid, written agreement for the purchase of the property.

---

[2]  Seller reserves all rights regarding the truth or admissibility of this allegation.

The only disputed issue before the Court is whether Yolanda Saul materially breached her obligation under the contract to deliver evidence of merchantable title, thereby excusing Buyers' performance. Yolanda complied with her obligations for at least three reasons: (1) the contract provided that Buyers were required to take title subject to "covenants, conditions, and restrictions of record," and Seller delivered a title commitment subject only to the "covenants and restrictions" of record; (2) even if the covenants and restrictions were not expressly permitted by the contract, the contract only required Seller to deliver evidence of "merchantable" title, and the *de minimis*, trivial matter in the Declaration does not affect merchantability; and (3) Buyers' professed reason for failing to purchase the property was merely a pretext for them to walk away from a sale price they had agreed to, which constitutes a violation of their covenant of good faith and fair dealing.

**I.     Because the Contract Permitted "Covenants, Conditions, and Restrictions of Record" and the Painting/Window-Washing was a Recorded Restriction, Yolanda Complied with her Contractual Obligation.**

Seller complied with her obligation to provide evidence of merchantable title by delivering a title commitment subject to "covenants, conditions, and restrictions of record."[3]

**A.     The Plain Language of the Contract Permits "Covenants, Conditions and Restrictions of Record."**

The title provision required Seller to deliver a title commitment that was "subject to no other exceptions *than those previously listed within [the] Contract* and to general exceptions contained in the commitment." The deed provision provided that Buyers would take the property subject to "covenants, conditions, and restrictions of record." Pursuant to the plain reading of

---

[3] A federal court sitting in diversity jurisdiction applies the choice of law principles of the forum state. *See, e.g., Equity Residential v. Kendall Risk Mgmt., Inc.*, 246 F.R.D. 557, 564 (N.D. Ill. 2007). Because the property was located in Illinois, the Court should apply Illinois law to resolve this dispute. *See In re Holland*, 366 B.R. 825, 830 (N.D. Ill. 2007).

6

these provisions, Buyers agreed to accept a title commitment that was subject to "covenants, conditions, and restrictions of record."

Indeed, courts in Illinois have consistently held that such title and deed provisions must be read together to define the scope of a seller's obligations under a residential real estate agreement. *See Becker v. Rowe*, 355 Ill. 189, 188 N.E. 918 (1933); *see also Nikolopulos v. Balourdos*, 245 Ill. App. 3d 71, 73, 75, 614 N.E.2d 412, 414-15 (1st Dist. 1993). For example, in *Becker*, the parties' contract required seller to deliver a warranty deed to the property "subject only to: . . . building and liquor restrictions of record." 355 Ill. at 189; 188 N.E. at 918. Prior to closing, the seller delivered a title certificate that showed the property was subject to a building restriction, and the buyer refused to purchase the property due to the perceived defect in title. *See id.* The Illinois Supreme Court held that the seller complied with his obligations under the contract because the buyer agreed to take title subject to building restrictions of record. *See id.*

Courts in other jurisdictions have confirmed that these provisions must be read together. *See, e.g., Laba v. Carey*, 277 N.E.2d 641, 642-45 (N.Y. 1971); *Stathakis v. Poon*, 744 N.Y.S.2d 473, 496-97 (N.Y. App. Div. 2002); *Caselli v. Messina*, 567 N.Y.S.2d 972, 973-74 (N.Y. App. Div. 1990). In *Laba*, the contract contained a title provision requiring seller to deliver insurable title subject to no exceptions other than those noted in the contract. *See Laba*, 277 N.E.2d at 642. The contract also contained a deed provision stating that the conveyance was subject to "covenants, restrictions, utility agreement and easement of record." *See id.* Prior to closing, the title company insured the property but excepted from coverage an easement and a restrictive covenant of record. *Id*. at 643. The New York Court of Appeals held that these "exceptions were matters specifically contemplated by the contract, [and] since there is no indication in the record that the parties intended anything other than the interlocking of the [deed] and [title] clauses, it is

our view that they must be read together to determine the scope of the seller's obligation." *Id.* at 644.

This construction is supported by well-established general principles of contract interpretation: "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 59 (2007). Rather, "because words derive their meaning from the context in which they are used, a contract must be considered as a whole, viewing each part in light of the others." *Id.*; *see also Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (applying Illinois law). Moreover, "a contract must not be interpreted in a manner that nullifies provisions of that contract."[4] *Atwood v. St. Paul Fire & Marine Ins. Co.*, 363 Ill. App. 3d 861, 864, 845 N.E.2d 68, 71 (2d Dist. 2006).

### B.  Seller Delivered a Title Commitment Subject to no Exceptions Other Than Those Identified in the Contract.

On or about May 22, 2007, Seller delivered a title commitment that contained a series of general exceptions. The commitment also contained the following specific exceptions:

---

[4] If Buyers did not want to take the property subject to "covenants, conditions, and restrictions of record," then they could have removed the provision from the contract. Or, as commentators suggest, they could have insisted that the matters of record be set forth specifically:

> It is always dangerous for a purchaser to sign a contract agreeing to accept property subject to unspecified or unknown encumbrances. A common term in form contracts or in short-hand terms commonly inserted by real estate agents provides that the property is being sold subject to easements and restrictions of record. For the purchaser, it is much safer to insist that the easements and restrictions be set forth specifically. Otherwise, the purchaser will lose the opportunity of backing out of the contract without being in breach if unacceptable discoveries concerning easements or restrictions arise from the title search.

14 POWELL ON REAL PROPERTY § 81.03[6][d][iii] (Wolf ed. 2000).

> "(20)(A) Terms, provisions, and conditions relating to the easement described as parcel 2 contained in the instrument creating said easement. (B) Rights of the adjoining owner or owners to the concurrent use of said easement
>
> (21) Covenants and restrictions . . . contained in the document recorded June 20, 1990 as document no 90292168."

Paragraph 20 refers to the beneficial easement that allowed the property to encroach on the adjoining property. Paragraph 21 refers to the "covenants and restrictions" in the Declaration. Although Buyers' refusal to close the transaction was ostensibly due to the inclusion of these matters (SOF at ¶ 18; Defendants' Second Affirmative Defense at ¶¶ 8, 10.), Buyers had no basis to object to these paragraphs.

First, Buyers had no basis to object to paragraph 20 because it concerns the beneficial easement that allows the property to encroach on the adjoining property. It is well-settled that buyers are not permitted to object to a matter of record that benefits the property. *See* C.J.S. VENDOR & PURCHASER § 353 (2008) ("An easement enhancing the market value of land is a benefit and not an encumbrance of which a purchaser may complain.") (citing *Sachs v. Owings*, 92 S.E. 997 (Va. 1917)); *DeJong v. Mandelbaum*, 122 A.D.2d 772, 773 (N.Y. App. Div. 1986) ("The existence of an easement as to the use of adjoining property does not constitute an encroachment upon the property to be sold so as to render title unmarketable."). Moreover, it would be a violation of the covenant of good faith and fair dealing for Buyers to object to the beneficial easement. *See Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 473-74, 809 N.E.2d 180, 193 (1st Dist. 2004) (parties must exercise their contractual discretion "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties").

Second, Buyers had no basis to object to paragraph 21 ("covenants and restrictions") because the matters therein were expressly permitted under the contract. As discussed above,

9

viewing the title provision and the deed provision together, Buyers were required to take title subject to "covenants, conditions, and restrictions of record." Paragraph 21 provides that the title commitment is subject to "covenants and restrictions" in the Declaration of mutual easements, which (as stated in paragraph 21 of the title commitment) was recorded with the Cook County Recorder on June 20, 1990. Thus, Buyers expressly agreed to take title subject to the matters described in paragraph 21.

Yolanda complied with her obligations under the contract and, therefore, Buyers had no basis to refuse to purchase the property.

## II. Seller Provided Evidence of Merchantable Title.

Even if the title exceptions were not expressly permitted by the contract, the contract merely required Yolanda to deliver evidence of "merchantable" title — not perfect title. Yolanda complied with this obligation by delivering a title commitment subject only to the *de minimis* and trivial matter described in the declaration. Because this matter does not affect merchantability, Yolanda did not breach — let alone materially breach — her obligations under the contract and therefore Buyers had no basis to refuse to purchase the property.

### A. The Contract Required Evidence of "Merchantable Title" — Not Perfect Title.

The title provision merely required Seller to deliver evidence of "merchantable" title:

> "Seller shall deliver to Buyers' attorney evidence of *merchantable title* in the intended grantor by delivering a Commitment for Title Insurance from Chicago Title & Trust bearing a date no earlier than February 1, 2007, in the amount of the Purchase Price, subject to no other exceptions than those previously listed within this Contract, and to general exceptions contained in the commitment."

(SOF at ¶ 7 (emphasis supplied).)

As noted above, it is well-established that "[t]he intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself."

*Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 59 (2007). "Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (applying Illinois law). Moreover, "the terms should be construed so that the contract is fair, customary, and such as prudent persons would naturally execute, and is rational and probable." *Id.* (internal quotations omitted).

Applying these principles here, Seller was merely obligated to provide evidence of "merchantable" title, not perfect title. As discussed above, the deed provision itself permits various exceptions, including "covenants, conditions, and restrictions of record." Under a plain reading of the contract, Seller was only required to deliver a title commitment that was *subject to no exceptions that would render title unmerchantable.*

Any other reading of the contract would render the term "merchantable" meaningless. Assuming that the commitment literally could be "subject to no other exceptions," then any exception in the commitment — no matter how *de minimis* — would constitute an impermissible title exception. This would require Seller to deliver evidence of perfect title, thereby rendering the provision for merchantable title meaningless. *Atwood v. St. Paul Fire & Marine Ins. Co.*, 363 Ill. App. 3d 861, 864, 845 N.E.2d 68, 71 (2d Dist. 2006) ("[A] contract must not be interpreted in a manner that nullifies provisions of that contract.").

Pursuant to the contract, Seller was merely obligated to deliver evidence of "merchantable" title by providing a title commitment that was subject to no exceptions that would render title unmerchantable. As discussed below, Seller complied with this obligation because the *de minimis* and trivial obligations described in the declaration clearly do not render title unmerchantable.

### B. Seller Delivered Evidence of "Merchantable Title"

The *de minimis* and trivial matters described in the declaration do not affect merchantability.[5] Merchantable title does not mean perfect record title; rather it means "title not subject to such reasonable doubt as would create a just apprehension of its validity in the mind of a reasonable, prudent and intelligent person." *Wilfong v. Schickedanz Agency, Inc.*, 85 Ill. App. 3d 333, 338, 406 N.E.2d 828, 832 (5th Dist. 1980). "A contract for merchantable title protects the buyer only from such defects as would cause a prudent purchaser to be apprehensive of future trouble. It does not provide him with a defense in the form of technical and unsubstantiated objections, permitting him to renounce the contract and escape liability." *Id.*

Under Illinois law, the defect must be substantial to render title to the property unmerchantable. *See id.* at 337-38, 406 N.E.2d at 831-32; *see also Brelie v. Klafter*, 342 Ill. 622, 174 N.E. 882 (1931) (existence of public road running through property and grant of life estate in portion of property to third-party does not render title unmerchantable); *Stevens v. Wilson*, 86 Ill. App. 3d 1047, 408 N.E.2d 496 (5th Dist. 1980) (existence of public utility easement does not render title unmerchantable); *Cox v. Supreme Savings & Loan Assoc.*, 126 Ill. App. 2d 293, 262 N.E.2d 74 (1st Dist. 1970) (existence of building code violation does not render title unmerchantable). Although the threat of future litigation can render title unmerchantable, the buyer must show that there is a "reasonable probability" of pending litigation, and buyer cannot "rely on speculation and insurance exceptions to claim the threat of litigation." *Wilfong*, 85 Ill. App. 3d at 338, 406 N.E.2d at 832.

This is consistent with the law in other jurisdictions. *See, e.g., Ortego v. First Am. Title Ins. Co.*, 569 So. 2d 101 (La. App. 1990) (servitude that permitted district employees to enter

---

[5] The issue of whether title to property is "merchantable" is a question of law for the Court. *See Nelson v. Anderson*, 286 Ill. App. 3d 706, 676 N.E. 2d 735 (5th Dist. 1997)

plaintiff's land in order to maintain and clean an adjoining drainage canal did not render title unmerchantable); *Lieb v. Roman Development Co.*, 716 S.W.2d 653 (Tex. App. 1986) (encroachment of adjoining property's metal fence on plaintiff's property did not render property unmerchantable).

Here, the title commitment provided evidence of merchantable title. Pursuant to the Declaration, the property owner is not obligated to do anything other than allow the adjoining property owner to have a small portion of an exterior wall painted, at the adjoining property owner's sole expense — a portion of the wall that is not even visible to anyone but the adjoining property owner — and, if necessary, to have a window washed.

Buyers' assertion that the property owner is technically obligated to "paint" the setback wall and "wash and maintain" the windows (Defendants' First Affirmative Defense ¶ 8) hardly affects its *de minimis* nature, and in any event elevates form over substance. Although the Declaration does state that the property owner shall "hire" a contractor, the adjoining property owner *must pay all expenses* associated with the painting and the window-washing. (SOF at ¶ 13.) The reality of the situation is that the adjoining property owner would undoubtedly have to take whatever little time and effort was necessary to get the contractor engaged. Indeed, the absurdity of the situation is evidenced by the fact that the adjoining property owner has *never* asked Seller to do anything for 20 years. (*Id.* at ¶ 15.) Nevertheless, any restriction or covenant is still *de minimis* and does not constitute a defect in title in the context of a $3.2 million transaction.

Because Seller complied with her obligation to deliver evidence of merchantable title, Buyers had no basis to refuse to purchase the property.

### III.  Buyers' Refusal to Purchase the Property Constituted a Violation of the Covenant of Good Faith and Fair Dealing.

Buyers' subsequent effort to negotiate a reduced purchase price provides evidence that Buyers acted in bad faith when they refused to purchase the property at the agreed-upon price.

There is a covenant of good faith and fair dealing implicit in every contract, including contracts for the purchase of residential real estate. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 473-74, 809 N.E.2d 180, 193 (1st Dist. 2004). The covenant requires the parties to apply their contractual provisions "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* Notably, in the context of a real estate purchase agreement, the parties cannot exercise their contractual discretion for the purpose of renegotiating a more favorable purchase price. *Forman v. Benson*, 112 Ill. App. 3d 1070, 1076, 446 N.E.2d 535, 540 (2d Dist. 1983) (affirming grant of specific performance where seller's attempt to renegotiate the purchase price provided evidence that he acted in bad faith in rescinding the contract).

As discussed above, Seller delivered to Buyers evidence of merchantable title, which was all that was required under the terms of the contract. Buyers were not permitted to make "technical and unsubstantiated objections" to the title commitment. Nevertheless, Buyers walked away from their contractual commitments in this $3.2 million transaction because the adjoining property owner has the right to have a small portion of a six-foot strip of an exterior wall painted at their own expense.

Buyers' attempt to seize upon such a trivial matter after agreeing to a price, and then realizing the market was declining, vividly demonstrates that Buyers' true motivation was to walk away from what they perceived to be a bad deal. This conclusion is bolstered by Buyers' allegation that they attempted to use the *de minimis* matter described above to negotiate a

14

significant reduction in the purchase price. *See Forman*, 112 Ill. App. 3d at 1076, 446 N.E. 2d at 540. Because Buyers acted in bad faith by making "technical and unsubstantiated objections" to the title commitment, this Court should grant summary judgment on liability in favor of Seller.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, Plaintiff respectfully requests that this Court enter partial summary judgment in favor of Seller and against Buyers on the issue of liability.

                                              Respectfully submitted,
                                              Yolanda Saul

                                        By:    s/ Joseph G. Bisceglia
                                                       One of her Attorneys

Joseph G. Bisceglia (#213535)
Andrew F. Merrick (#6290213)
JENNER & BLOCK LLP
330 North Wabash
Chicago, IL 60611
(312) 923-2784

Date:   May 28, 2008